Tatxoe, Chief-Justice.
The deed of gift executed to the three Trustees of the Friends Association does upon its face, convey the negroes to them for the purposes an-thorised by tiie act of 1796, and deciding from the conveyance alone, passes a valid title to them. But as the Defendant was a stranger to the deed, it is competent for him to give parol evidence of the real objects of the deed, and of the trusts it was intended to effect, beyond those expressed, (3 Term Rep. 474-8 Term 379—Starkie on Ev. P. 4, 1051—10 Johns. 229.)
Before the passing of the act of 1796, the Society of Friends had no capacity to acquire property as an Association, because they were not incorporated $ they could take only in their individual characters, the gift being confined to the very persons in existence when it was made. To enable it to manage its own affairs and to own property for the. exdusho use of the Society as a religious association, without the continual necessity of conveying it from one to another, the act of 1796 was passed. A corporation exists but in contemplation of law, and possesses those properties only which the law confers upon it. By the very act of incorporation, and without any special power to that purpose, it is incidental to it to acquire property. But as it is the creature Of legislative will, it. is competent for the Legislature to limit its capacities and powers, as it may think proper. It may withhold altogether its capacity to acquire property ", it may consequently limit and restrain it to definite purposes. It cannot be said of the Trustees of this Society that they have a general power to purchase and hold property, because the act declares that they shall hold it-in trust, for thé «tse and benefit of the Society". If then the case discloses the fact that the Trustees hold this property for an use different from that of the Socie* ty, and for the benefit of persons not contemplated by the-Legislature when they gave the power, and for objectg *201 that are not less adverse to the words and spirit of the act, than to the general policy of the law, I think it will 1 follow that the Plaintiffs have no title to recover.
'What are the real objects of the donation ? The individuals composing this Society believe it to be repugnant to their religious principles to become the owners of slaves, and will not employ their labour to the profit and advantage of themselves, or of the Society. The Trustees were to act as guardians to the slaves, and to hold them for the benefit of the slaves themselves, who were to receive the surplus of the profits of their labour for their own emolument, and ultimately to emancipate them, whenever it could be done consistently with the laws of the State.
So far then from the Plaintiffs taking the property for the objects permitted by the act of 1796, it appears to ¡me that nothing but the name is wanting to render it at once a complete emancipation ; the Trustees are but nominally the owners, and it is merely colourable to talk of a future emancipation by lavr, for as none can be set free but for meritorious services, the idea that a collection of them will perform such services, under the construction which those terms in the act of 1777 have uniformly received, is quite chimerical.
It is said that the legislature could not mean that the Society should take no property, hut such as it derived a pecuniary benefit from. Certainly that was not their intention ; but it evidently was their intention that the property they were allowed to acquire should subserve in some way, the legitimate object of a religious association, which every man can comprehend when stated, though it may be difficult to give a definition that shall include the whole.
A place of worship, of interment, the support of a minister, the means of educating and assisting their pool’ members, and various other objects which yield no pe- *202 cuniai'y profit, we perceive at once to be within the scope of the permission.
But if a sense of religious obligation dictates to any Society the exercise of an enlarged benevolence, which however virtuous and just in the abstract, the policy of the law, founded on the duty of'self preservation, has forbidden, it irresistibly follows that a transfer of property so directed, must be void.
Nor do I feel the force of the remark that the property belongs to the Society, tiiat they may make profit out of it if they choose, or sell it or dispose of it in any way that another owner might. This is to presume that a Society not less rémarkable for the purity of its principles, than for ah unshaken steadfastness in maintaining them, will at once,degenerate from their long tried morality. The whole history of the people called Quakers, shows that neither prosperity nor adversity, favour or persecution, or any known vicissitude of their condition, has ever interrupted the even tenor of their ways. I firmly believe, indeed I consider it morally certain, that if the Plaintiffs recover, this property will be disposed of in the manner described by the witness, and in no other. -
It is true that an individual may purchase a slave from gratitude or affection, and afford him such indulgencies as to preclude all notion of profit. The right of acquiring property and of disposing of it in any way consistently with law, is one of the primary rights which every' member of society enjoys. But when the law invests individuals or Societies with a-political character and personality, entirely distinct from their natural capacity, it may also restrain them in the acquisition or uses of property. • Our law allows the Trustees to hold them for the benefit of the Society^ whereas in truth, they hold them for the benefit of the slaves themselves, and only in the name of the Society.
*203 I cannot distinguish this case, in principle, from the former decisions wherein trusts for the emancipation of s]avegj [VAve been held void in Equity, on the ground that the law had forbidden such attempts, except in the manner prescribed by the act of 1777. There, resort was necessarily had to equity, because the legal title passed to the executors ; but here, as it is justly remarked by the Judge who tried the cause, evidence of the beneficial use for the Society, forms a necessary part of the Plaintiffs title, of which, though the deed is prima facie evidence, it is not conclusive.
Upon the whole, my opinion is, that the Plaintiffs have no legal title, and although the province of this Court is to administer tiie law as they find it, without any regard to consequences, yet my judgment is in some degree fortified by the belief that a contrary decision would produce most, if not all, of the ill effects which the Legislature sought to avoid by the act of 1777.
If that law could be eluded by transferring slaves to this Society, there is no foreseeing to what extent the mischief might be carried. Numerous collections of slaves, having nothing but the name, and working for their own benefit, in the view and under the continual observation of others who are compelled to labour for their owners, would naturally excite in the latter, discontent with their condition, encourage idleness and disobedience, and lead possibly in the course of human events to the most calamitous of all contests, a helium-servile.
Henderson, Judge.
"What may be the effect of the deed of William Dickenson to Thomas Cox, and the other original donees, viewing them merely as individual or natural persons, we are not called on to say. The form of the action, or rather the party Plaintiffs necessarily brings into discussion its validity under the act of 1796, *204 authorising religious societies to purchase and hold pro-perfy; for without the aid of that or some other act creating them a corporate or artificia! body, the present Plaintiffs cannot sustain this action, there being no pri-vity or connection between some of the present Plaintiffs and the original grantees. By that act religious societies are riot made corporate bodies with unlimited and unqualified powers of acquisition, for were that the case, it is admitted that the use or trust upon which they held their acquisition, would not aifect their Ieggl title. If the use or trust was vague or unlawful, it would be a reason why it should result to some other person or for some other purpose, but such modification of the use would not affect the legal ownership; because.in this case the Trustees having a general and unqualified capacity to acquire property, as individuals or natural persons, the use or trusts upon which such acquisitions were held with such bodies, as with natural persons, would not affect their estates at law. The act of 17136, however, does not confer a general and unqualified power of acquisition, but only a limited and restricted one, to-wit, for the use and benefit of the Society ; it is therefore the use which gives to the transaction its artificial character, by bringing to its aid the act of 1796, if such use is for the religious Society. The Society Ceither itself or its Trustees, which is immaterial as regards this question) are invested with corporate-or artificial qualities,, qualities commensurate with the object in view, but if the use or trust is not for themselves as a religious Society, but for others, they can derive no aid from the act. They must then rest on their rights as individuals or natural persons, and it would seem to follow as a most necessary consequence, if this use is forbidden by law, if it is contrary to the policy of the state, that the transaction can derive no aid from an act of the Legislature by which the use, and the use only, gives character and valU *205 dify to the deed. Tn saying (hat it is the use which gives character and validity to (he deed, l mean not to assume , the power of examining into the question, whether the use ¡s actually beneficial to the religious Society or not, it is sufficient (fiat they as a religious Society think it so; of this they are (he sole and exclusive judges $ but when the question is presented to me, it is my duty to see-that such use does not violate the laws or policy of (he state, and I think in this case, the use offered to be shown on the part of the Defendant, from an examination into which the Plaintiffs shrunk, and which must therefore (if the testimony is admissible) he taken as true, is forbidden by law, is contrary to the policy and hostile to the best interests of the state. It is contrary to law to permit slaves to hire their own time, the pernicious effect this must produce on our slaves is too obvious to require illustration ; neither is any person permitted to emancipate his slave by his own act, it requires the sanction of the constituted authorities of the state to effect it, and no one I think, can for a moment, doubt the policy of these acts. Í must also confess, after a careful examination of the case, that I can discover no difference in effect, so far as regards the evil example to our slaves, between hiring to (hem their own time, and placing them on farms, and giving to them what they make after deducting the expenses of supporting them ; and no great difference between emancipating them, and holding them in the above mentioned manner, until they can be emancipated. It must produce dissatisfaction and a- restless spirit among others, the very evils the Legislature designed to prevent. There can be nothing. I think, in the objection that the uses and purposes for which this Society bold these slaves, not being expressed in the deed, averments supported by parol evidence are inconsistent-with,it, and therefore inadmissible to show what those uses are 5 in the first place, they <u e not inconsistent with. *206 the deed, the deed being general. But even between tbc parties to a deed any averment may be made, and of course proof received, to show its nullity. When strangers are concerned, and how this Defendant claims does not appear, consequently we must view him as a stranger, such averments are very clearly admissible- Tho recitals in a deed can bind the parties only, when it is taken as valid, but in endeavoring to show that it is void, its recitals and affirmations may be disproved by any one, either party or stranger, otherwise the parties by false recitals, can protect the most unlawful contracts from scrutiny.
Haui,. Judge,
dissenliente.-r-The art of 1796, ch. 457, authorises religious societies and congregations to appoint Trustees, who may purchase lands and receive donations for their use and benefit, ami after such purchase or donation, the Society is declared to possess the absolute estate of all such property. The principal and only qualification required by the act, is that the Society shall be a religious one.
But.it is stated in this case, that it is contrary to the religious principles of the Association of Friends, to hold slaves to their own use, and it is argued,.that on that account tho conveyance is void, under which they claim the slave, in question.
I do not understand from that statement that they are averse from holding a title to slaves, or from being considered as haring a right to the use of them, but that in point of law’they may have the legal title, and aright to the use, hut they claim the right of disposing of that use iiivany way they may think proper, provided that disposition does not conflict with the laws of the land.
That they may gratify their thirst for gain w ith it, or render it subsen ient to the gratification of any other de* sire notprohibited by law — that the enjoyment of the use *207 consists in the freedom of disposing of it — that it is op» tional with them to build churches, employ preachers or give it away in charity in any other way their conscicn-ces approve of.
Preachers, individually, have the capacity to purchase slaves, and when they become owners of them are, like other citizens, subject to the laws made for their government, and when they form themselves into religious Societies, the Legislature confers upon them the capacity to purchase, the transfer of power is general. The Legislature have made no exceptions on account of religious tenets, and it appears to me not to be the province of this Court to discriminate and make any. As to their liberation of them, for which purpose it is said they purchase them, it can be effected only in the way pointed out by law, and when it can be effected in that way they have a right in common with other citizens, to avail themselves of it. If they permit them to hire their own time or otherwise mismanage them, they are like other citizens, amenable to the law for such conduct. It is not for this Court, by legal anticipation, to apply a preventive remedy.
If we take a step into the moral world and contemplate the unbiassed principles of our nature, we will discover for the exercise of our discretion a wide range between humanity and cruelty, and we might not find fault with those who mingled with their religion the dictates of the one and carefully abstained from the exercise of the other.
But if on account of our unfortunate connection with slavery, these sentiments tend to a mistaken policy, if self preservation impels us to a different and contrary course, that course should be pointed out by the Legislature; the mischief and the remedy are both with them. If the act of 1796 hath produced the one, they can, by some other act furnish the other.
*208 Therefore the best consideration I have been able to give this case, results ib a conviction that the rule for a new-trial should be made, absolute. '
Per curiam. Judgment affirmed.