By an amendment Eliazur Hunt, Timothy Manney, Josiah Unthank, and George Swain, agents of the New Garden Meeting, were made defendants, and the plaintiff alleged that they had received the said slaves and surplus of the executors, and had hired out the former, and she prayed the same relief against them which in her original bill she had prayed against the executors.
The executors by their answer insisted that the New Garden Meeting as a body politic could take and hold slaves, and averred that believing the bequest to be valid, they had in August, 1816, delivered the slaves, and paid over the residue to the agents of that meeting. They denied notice of the plaintiffs' claim until 1818, after they had delivered the slaves. They stated that in December, 1817, Wright presented to them a duly authenticated power from the plaintiff, authorizing him or his substitute to settle and compound with them for the plaintiffs' share in the estate of their testator; that Wright appointed one Draughn his substitute, and that they came "to a full and fair settlement and compromise for all the interest of the plaintiff in the estate of (439) their testator, for the recovery of which the said Willie Wright had filed a bill of complaint in the court of equity for the county of *Page 352 
Guilford," and that Wright received the consideration stipulated to be paid by them upon the compromise. And they averred positively that this settlement and payment was made without notice of the revocation of his power.
Two papers executed by Wright, dated 12 and 14 December, 1818, were filed. The first was a release, in which it was recited that "Willie Wright of, etc., attorney and agent in fact for Betsey Redmond, of Fayette County, Kentucky, by virtue of her power, investing me with all right, etc., have remised, etc." This was signed and sealed by Wright, without the addition in any way of the name of the plaintiff. The other was without a seal, was signed by Wright alone, without reference to his principal, and acknowledged the receipt of $450 as a consideration of the compromise. The last was relied on as a bar and was filed as an exhibit to the answer. The first was proved by the deposition of an attesting witness.
The answer of the agents of the New Garden Meeting set forth at large the religious belief of the society, and insisted that as a society they could take and hold slaves. They admitted, however, that slaves held by the society were not worked for its profit, but that the money realized from their labor was deemed by the society a fund to be held in trust for the slaves, and to be used for their spiritual and temporal advancement. They charged that the plaintiff "heretofore preferred in this court her bill of complaint against the executors of Thomas Wright for the same causes of complaint and relief sought in this bill, and that after full consideration of the claims of the respective parties, and for the purpose of finally disposing of and adjusting all matters in litigation and equitable consideration involved therein, the said controversy and suit was compromised by the parties at and for the sum of $450, which was paid by the said executors to the said plaintiff, by her (440) attorney duly authorized and empowered, to wit, one Willie Wright, who as agent and attorney managed and conducted the said suit; and for which said sum paid as aforesaid the said W. W., attorney as aforesaid, released and conveyed to the said executors all the title, interest and claim of the said plaintiff in and to the estate of the said testator, and that in pursuance of the said compromise made as aforesaid a decree of the court of equity for the county of Guilford was duly made at, etc., in the following words, to wit: "The plaintiff, by her attorney in fact, W. W., having sold and assigned and released all her right and interest in the slaves and other property of Thomas Wright, deceased, to the defendants in consideration of $450 paid to him: bill dismissed, each party paying their own costs," and they prayed the full benefit of this decree, as if it had been specially pleaded. *Page 353 
The release and conveyance mentioned in the answer was that above stated, filed by the executors. These defendants exhibited a copy of the former bill and decree, which fully supported their answer and plea. Replications were taken to these answers, and the proofs filed were very voluminous. A condensation of them is unnecessary, as they are stated in the several opinions delivered in the progress of the cause. It was argued at great length at June Term, 1831.
The general question upon the validity of the charity created by this will was not much argued in this case. I presume the counsel considered, as the Court does, that it is not open to discussion. Qualified emancipation of the kind set up by the answer, and proved so distinctly by the member of the Society of Friends who has been examined as to it, stand upon the same ground as a bequest directly for that purpose. However praiseworthy the motive for accepting such a trust, or however benevolent the will of the donor may be, it (441) cannot be supported in a court of justice. A stern necessity arising out of the safety of the Commonwealth forbids it. Haywood v. Craven,4 N.C. 360, and Huckaby v. Jones, 9 N.C. 120, are leading cases; the one a direct declaration of the purpose of emancipation, and the other of one collected by the Court from the terms of the will. They were followed byTrustees v. Dickinson, 12 N.C. 189, and Stevens v. Ely, 16 N.C. 493, which leaves no part of the ground unoccupied. The former was on a conveyance to the Friends for the same purpose designated in this bequest, only this is stronger, because here is a bequest to the slaves, which shows, on the will, that the testator meant emancipation. That is not an odious, but it is a dangerous and unlawful species of mortmain; and a trust results to the next of kin, where there is no residuary clause.
Several bars to an account are set up here. The first is that of a release, which is relied upon in the answers of the executors and also of the trustees. That annexed to the answer, and said to be a copy, bearing date 14 December, 1818, is not a release from anybody, not being under seal. And it might, perhaps, be proper to exclude any other, because that and that alone is relied on in the answer. But the reading of the original proved by Hubbard, and bearing date 12 December, 1818, was not objected to, and will therefore be considered by the Court.
Neither of them can avail the defendants, because neither is executed in the name of the principal. It is not material in what form the deed be signed, whether A. B. by D.C. or D.C. for A. B., provided it appear *Page 354 
in the deed and by the execution that it is the deed of the principal. But that must appear; and the cases cited put that beyond doubt. To them may be added Combe's case, 9 Rep., 75, Frontis v. Small, Ld. Raym., 1418, andWhite v. Cuyler, 6 Term, 176.
As a positive bar, then, these papers are nothing. They do not mention any sum of money paid. But the answers state that money (442) was paid, namely, the sum of $450; but Hubbard, the subscribing witness examined by the defendants, says that the sum agreed on was $300, of which only part was paid, a note being given for the residue. A question has been made on this, whether the payment to Wright was good, since his power was revoked and the parties had notice of the revocation. The Court would not declare that fact, were it in the least doubtful, but leave it to arise on the master's report, upon his allowing or disallowing the sum paid to Wright as a payment to the plaintiff. But it is positively sworn by Scott that he gave notice of the new power to Swain, who made the agreement for the executors with Wright, and through whom the money was paid. He is supported by the testimony of Draughn, who says that when he came to see Wright next day at Greensboro, he heard of the revocation, and told Wright; and that he had before seen the defendant Coffin, and been told by him that he had seen John C. Redmond, the agent appointed by the second power, and had a conversation with him respecting the suit, though he did not say that he told him of the second power. From this it seems certain that the power to the son was at the place, in the possession of Scott; and no conceivable reason can be assigned why he or the son should conceal it, while the compromise was going on, and disclose it immediately afterwards. The Court must, therefore, take it that the revocation was known to Swain, who was the agent in the business, and consequently to the executors, and declare that the payment was made by the executors, or on their behalf, in their own wrong.
If this were not so, it certainly could not be set up but as a satisfaction pro tanto. A payment of a less sum is not a satisfaction for a greater than due, even at law. Much less does a payment by a trustee of a part of the fund belonging to a cestui que trust extinguish the right to the residue. Here, besides the slaves, the plaintiff was entitled to more money than was received. But it is unnecessary to pursue this point, because even the sum advanced was not a payment to the plaintiff, for want of authority in Wright then to receive it.
(443) It is, however, contended that a decree pronounced in a former cause, brought by the plaintiff against Coffin and others, the executors of Thomas Wright's will, is a bar to this suit. It is not pleaded by either of the defendants, nor is it relied on in the answer of the executors; but it is brought forward in the answer of the trustees of the *Page 355 
Quaker society to the bill as amended, so as to make them parties. And the transcript of the first suit has been read in evidence. From that it appears that a bill was filed in February, 1818, by this same plaintiff for an account of Thomas Wright's personal estate against his executors, who are also part of the defendants in this suit. There were no other defendants but the executors. No answer was put in, and after the compromise before spoken, viz., at April Term, 1819, the entry in question appears.
It has been objected by the plaintiff that this does not bar as a decree, because it does not profess to be the act of the court, or to be founded on the merits, but that of Willie Wright himself, after the revocation of his power, in execution of his agreement. Perhaps, if strictly construed, it might be held so, and therefore only obligatory as an agreement. But I believe the decree is clearly removed out of the case upon other and more general principles. When a former decree is pleaded and relied on as an absolute bar, proprio vigore, it must be a decree determining the very point in a suit between the same parties. This is the case at law, and hence a judgment against A. is not evidence in suit against A. and another. In equity there may be this difference: that as the liability of the several defendants in this Court may be several, the introduction of a new party in a second suit shall not prevent a former decree from protecting one of the defendants who is called in question a second time for the same matter; for as to that matter; the parties are the same. But a decree in favor of one cannot protect another who was not a party, unless he be a privy. And, indeed, a stranger thus introduced cannot use the decree at all, as such, because it cannot be used against him. I will not say that the executors might not have relied on this as (444) a former decree; but the other defendants cannot set it up, because they are not bound by it, being neither party nor privy. Indeed, in this very case they have objected to the reading of a deposition taken in the former suit, upon this ground, and the objection was sustained. The reason is, if they had been defendants before, the decree might have been different, because other evidence might have been offered. 1 Phil. Ev., 250, 252, where the cases are collected. I am now speaking of the decree operating as being an adjudication, and not as founded on a compromise; in which last case it may be used by anybody as evidence of the fact of satisfaction. The privity between the executors and the society did not then exist. It never did extend to anything but the slaves, for the residue is not given to the society, but to the slaves, and the bequest is merely void. Then, as to the slaves, they were delivered over on 16 August, 1816, to the trustees of the Quakers, as alleged in both the answers in this suit. There is a privity between trustees and cestuis que trust as long as that relation continues; and a legatee is bound by and *Page 356 
can avail himself of a judgment or decree for or against the executor while the trust is open and the funds in the hands of the executor. But after the trust estate is conveyed to the cestui que trust, or the legacy assented to and the property delivered to the legatee, there is no further privity. The legal estate is in the legatee himself. A suit, then, against the executor, founded on his acts or breach of trust, does not affect the legatee, who claims above it and by a legal title prior to the institution of the suit. When the privity is destroyed, the consequence necessarily follows, namely, that as a stranger, he can neither be benefited nor injured by a decree in a suit against the executors; for the estoppel of res judicata like all others, must be mutual. Here the trustees of the society did not come to the estate since the former decree, nor pendente lite, but before the former suit was (445) instituted. And as to the money arising from the perishable estate, that was paid over to them without any pretence of right, and, therefore, though paid after the first suit, it must be considered as remaining, for the purposes of this suit, in the executors' hands.
The next consideration is, whether the decree protects the executors themselves — that is, conclusively. They have not relied on it. Can another set it up for them? Or, when not relied on as a positive bar in the pleadings, but offered in evidence, is it not open to an investigation of the merits of the demands determined in it? At law, a former judgment is conclusive; but to make it so it must be pleaded (if the party have an opportunity) as an estoppel. And if it be not pleaded, the matter is at large; because the party may think that he can do better than he did before. Vooght v. Winch, 2 Barn and Ald., 662. Here, the executors may have been conscious that the decree was obtained by collusion with Willie Wright, the removed agent (as it was certainly entered after notice of the revocation of his power), and not willing to litigate it, and to have chosen to rest their case upon its merits. It is not for another to prevent that. Again: the plaintiff might have dismissed that bill upon the discovery that the legal title of the slaves had passed by the assent to the legacy, because she did not choose to take a personal decree against the executors, who might be insolvent, or because she wished to recover the specific chattels. She may follow the property; and a bill for that purpose is not barred by a previous bill against another person through whose hands it has passed, unless the privity then existed, and unless, at any rate, it appear that in the first suit the right to the chattels be the very point decided. Both because there was no privity between these two sets of defendants at the time of the former bill, and because new matter, that is, a right to specific relief against another person, not a party before, upon a state of facts not brought forward in the first suit, that decree does not bar this suit. But if it would have that *Page 357 
effect, it would extend only to the persons in whose favor that decree was pronounced, if relied on by them. They have waived the bar, and have elected to have a decision upon the merits, as well they may, (446) if they wish to assume any appearance of fairness as between the other parties. They ought to desire that the right should prevail between them; and, therefore, very properly, left the case open to a decision of it. As it would be enough for them that they delivered the legacy bona fide, they ought not to attempt to conclude the true owner, if she be such, from recovering back that which they delivered over by mistake.
As the case stands, then, upon the pleadings, the former decree (if it be one) does not prevent this suit going on. The former defendants submit that it shall. The new defendants cannot forbid them. And the new defendants cannot avail themselves of the proceedings, as such, in a former suit to which they were not parties nor privies.
It is next objected that the plaintiff has not shown herself next of kin of the testator. It is common to direct an inquiry to ascertain who are next of kin; and the bill would not be absolutely dismissed on the hearing upon that ground, where the relation is not denied, though not admitted in the answer. But here there is prima facie evidence in favor of the plaintiff. The testator had no issue, nor is any parent or other brother or sister shown. The plaintiff alleges that she is sole sister, and resides in Kentucky. Her residence is proved, and there is no evidence that another of her name lived there. It is proved by a witness that the testator said he had a sister living in Kentucky, by the name of the plaintiff, and that he corresponded with her husband; and spoke of no other brother or sister. And further, in both the letters of attorney she recites her relationship, and upon the faith of that, and other information acquired by the defendants, probably from Willie Wright (who was a relative), they treat with Wright as her agent for the whole estate. After this, the defendants cannot say she is not to be presumed of kin, at all events, until upon inquiry, if the defendants ask for it, the contrary shall appear.
Another question of some difficulty was touched on at the bar, (447) which the Court will not decide without further argument. It is whether the testator's widow is entitled. Clearly, she was not against the charity, unless she dissented. Thence the argument arises that she cannot say she was not to have a part only in favor of the trustees; but that under our act of Assembly the legacy is a satisfaction of her whole claim on the estate, because the testator must be supposed to make the bequest in reference to her rights. On the other hand, this being a legacy which fails for its illegality, it may be said that intention is out of the case altogether; for if the intention prevailed, both the widow and next of kin would be equally included. It becomes a case where the *Page 358 
law disposes of the fund, because in the case that has happened no intention is to be collected either way; and when the law distributes, there is but one rule, which is the statute. Possibly there may be a distinction between an undisposed residue and that of a legacy failing, as this; and possibly, too, the act of 1784 may bar her right in both, as she did not dissent. The Court inclines to let in the widow; but it is too general a question to be decided without having the widow's representative before the court and without full argument. It will be left, therefore, to be considered of by the plaintiff's counsel.
A motion was made on that side to remit the cause for amendment in another particular; and if they deem it expedient, on this point, to make the widow's representative a party, the case may go back for that purpose, as we do not wish to conclude the question unless the case is put into such a shape as will allow a full hearing to the claims of the widow. But if the plaintiff chooses to bring on a final hearing here, relying upon her exclusive right, she may do so, at the risk of having her bill dismissed for want of all proper parties, in case the Court should think the widow entitled.